IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

U.S. DISTRICT COURT
DISTRICT OF IDAHO

NOV 3 , 2001

| | |
|---|---|
| IDAHO COALITION UNITED FOR BEARS, et al, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| PETE T. CENARRUSA, in his official capacity as Idaho Secretary of State, | ) ) ) |
| Defendants. | ) ) ) |

Civ. No. 00-0668-S-BLW

MEMORANDUM DECISION

## INTRODUCTION

The Court has before it the plaintiffs' motion for summary judgment, and the States'

motion to dismiss or, in the alternative, for summary judgment. The Court heard oral argument

on November 29, 2001, and took the motions under advisement. After further review, the Court

finds that the residency requirement in Idaho Code § 34-1807 is constitutional, and that the

following statutory provisions are unconstitutional: (1) the requirement in Idaho Code § 34-1805

that a petition must contain signatures from 6% of qualified electors in each of 22 counties; (2)

the provisions in Idaho Code § 34-1815 that make unlawful the circulation of false statements

and the failure to disclose material provisions in a petition; and (3) the provisions in Idaho Code

§ 34-1821(a) that purport to make unlawful the selling of signatures. The Court's analysis is set

forth below.

**Memorandum Decision – page 1**

## FACTUAL BACKGROUND

Idaho allows its citizens to make laws directly through initiatives placed on election ballots. *See* Idaho Const., Art. III, § 1. The Idaho Legislature has enacted enabling legislation that defines Idaho's procedures for conducting initiative and referendum elections. *See* Idaho Code § 34-1801, *et. seq.* The plaintiffs challenge amendments to these statutes passed in 1997, and seek to strike four conditions Idaho places on the ballot-initiative process: (1) the requirement in I.C. § 34-1805 that petition sponsors obtain signatures equal in number to at least 6 percent of the qualified electors from each of 22 counties; (2) The requirement in I.C. § 34-1807 that only Idaho residents may circulate petitions; (3) the criminalization in I.C. § 34-1815 of willful and knowing publication or exhibition of false statements concerning the contents, purport or effect of a petition; and (4) the criminalization of "collecting petitions for hire" contained in I.C. § 34-1821.

Plaintiff Idaho Coalition United for Bears (ICUB) is a group that seeks to advance its supporters' goals through the initiative process. The plaintiffs also include the Initiative and Referendum Institute (IRI), a group that seeks to further the rights of citizens to participate in the initiative process, and three individuals who have organized petition drives in attempts to place initiatives on the ballot in past years.

One of those plaintiffs, Donald Morgan, a member of the IRI, has sponsored successful initiatives in the past and is preparing a term limits initiative for 2002. He states in his affidavit that the 1997 amendments "make it more expensive and more difficult to collect the necessary signatures. *See Morgan Affidavit* at p.3, ¶ 9. Because of this expense, Morgan states that "our organization must expend most of its resources on just one proposal. We have other proposals

we wanted to see enacted, but this law prevents us from pursuing those other measures." *Id.* Morgan states further that the required signatures "cannot be done solely with volunteers," and that the IRI "has members and supporters who do not live in Idaho, who would like to circulate initiative petitions in Idaho, but who are prevented from doing so by current law." *Id.* at ¶¶ 10-11.

Another plaintiff, Lynn Fritchman, the chairperson of ICUB, states that the 1997 amendments have "rendered it impossible for us to collect the signatures required to place our initiative on the ballot. At this point, we have determined that we could not qualify any initiative on the ballot and so we have given up any plans to propose an initiative for the immediate future." *See Fritchman Affidavit* at p. 2, ¶ 4. Fritchman also observes that ICUB could not collect the required signatures solely with volunteers. *Id.*

A third plaintiff, Ron Rankin, has sponsored initiatives in the past and plans "to work on future property tax initiatives if the laws are sufficiently modified to make that possible." *See Rankin Affidavit* at p. 2, ¶ 2. Rankin states that "I personally am worried about [criminal sanctions] being imposed against me. I do not know what will be treated as legal and what will be considered unlawful, and I fear that the only way I will find out the answer to that question may be as a Defendant in a criminal prosecution." *Id.* at ¶ 4. Rankin asserts that the amendment provisions that prohibit paid signature gatherers and out-of-state money have "rendered it impossible for us to collect the signatures required to place our initiative on the ballot." *Id.* at ¶ 5.

Since the 1997 amendments were put in place, no individual or group has made a "bona fide attempt . . . to qualify an initiative for placement on the ballot." *See Ysursa Affidavit* at p. 4,

¶ 8. The parties have not identified any criminal prosecutions that have been brought under the amendments. *Id.* at ¶ 9.

## ANALYSIS

### 1. Ripeness

The Court issued an earlier decision on Idaho's motion to dismiss, finding that the plaintiffs have standing. Idaho now asserts that this controversy is not ripe for adjudication because plaintiffs "have not alleged any facts that show the 1997 amendments . . . have been or threaten to be enforced against them." *See Idaho's Memorandum in Support of Motion to Dismiss* at pp. 3-4.

The Ninth Circuit has recognized that the doctrine of ripeness "merges almost completely with standing." *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1143 (2001). Whether the First Amendment issues are analyzed under the doctrines of ripeness or standing, the inquiry is whether "the plaintiffs face a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Id.* (internal quotations omitted).

*Thomas* does add a gloss to the ripeness inquiry, directing courts to examine whether "the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.*

Applying that test here, the plaintiffs have articulated concrete plans to sponsor specific initiatives if the 1997 amendments are repealed. The plaintiffs' past activities in sponsoring

**Memorandum Decision – page 4**

initiatives lend credibility to their allegations about their future plans. While there is no evidence that any Idaho prosecutor has actually prosecuted anyone under the 1997 amendments, or threatened to do so, that is probably due to the fact that no person has tried to qualify an initiative since the 1997 amendments.

The bottom line is that plaintiffs' asserted harm is not "imaginary" or "speculative." As discussed above, plaintiff Rankin testified that he has curtailed his initiative activity because he is concerned about criminal liability. It is this chilling effect, rather than any actual criminal prosecution or a prosecutor's threats to prosecute, that renders the case ripe for resolution: "[T]he alleged danger is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. American Booksellers Ass'n Inc.*, 484 U.S. 383, 393 (1988). The Court therefore rejects Idaho's argument that the case is not ripe for resolution.

## 2. Standard of Review

The plaintiffs have brought challenges under both the Equal Protection Clause and the First Amendment. The Court will outline the standards for reviewing each of these challenges.

Under the First Amendment, petition circulation "is core political speech because it involves interactive communication concerning political change." *Buckley v. American Constitutional Law Foundation*, 119 S. Ct. 636, 639 (1999) (internal quotations omitted). First Amendment protection for such interaction "is at its zenith." *Id.* "[S]tate regulations imposing severe burdens on speech . . . [must] be "narrowly tailored to serve a compelling state interest." *Id.* at 642 n. 12.

The Supreme Court in *Buckley* found that three state laws severely burdened speech by making it less likely that people would want to circulate petitions. These laws required that

**Memorandum Decision – page 5**

circulators wear a name badge, be identified by name in reports, and be registered voters. All three requirements, *Buckley* held, "limited the number of voices who will convey [the initiative proponents'] message and, consequently, cut down the size of the audience [proponents] can reach." *Id*. at 644 (internal quotations omitted). Finding no compelling interest to justify this severe burden on speech, the Court struck down the three restrictions.[1]

The standard of review for an analysis of ballot access restrictions under the Equal Protection Clause was set forth in *Burdick v. Takushi*, 504 U.S. 428 (1992). There, the Supreme Court expressed dissatisfaction with the traditional Equal Protection analysis that employed strict scrutiny of laws affecting fundamental interests or suspect classifications. *Burdick* observed that every restriction on ballot access affected the fundamental right to vote and to associate with others for political ends, and would therefore be subjected to strict scrutiny. *Id*. at 434. That level of scrutiny, *Burdick* implied, would be fatal to the restriction and would therefore "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id*. To avoid that result, the Court adopted a slightly different test to govern ballot access restrictions. Under this test, "severe" restrictions on the right to vote or to associate "must be narrowly drawn to advance a state interest of compelling importance." On the other hand, if those rights were subject to "reasonable, nondiscriminatory restrictions," the "State's important regulatory interests are generally sufficient to justify the restrictions." *Id*.

This Equal Protection standard of review set forth in *Burdick* dovetails precisely with the

---

[1] *Buckley* recognized that a state has a "substantial" interest in protecting the "integrity of the initiative process, specifically, to deter fraud and diminish corruption," *id*.at 648, but held that the three restrictions under examination did little to further that interest given that state law already prohibited forging signatures, and voided initiatives if circulators violated laws. *Id*.

**Memorandum Decision – page 6**

test Justice Ginsburg employed under the First Amendment in *Buckley*. *See Buckley*, 199 S.Ct. at 642, n. 12. Thus, under either constitutional provision, this Court must determine if the restriction is a "severe" restriction on the right to vote, to associate with others for political ends, or to free speech. If the restriction is "severe," it may be upheld only if narrowly drawn to advance a compelling state interest.

### 3.  Analysis of I.C. § 34-1807

The Court turns first to the requirement under I.C. § 34-1807 that any person who circulates a petition for an initiative must be a resident of the state of Idaho. *Buckley* specifically declined to consider whether a residency requirement "would be upheld as a needful integrity-policing measure." *Id*. at 645.

To determine the applicable standard of review, the Court must determine if the residency requirement imposes a "severe" burden on speech. *Buckley* reviewed the requirement that circulators be registered voters under the strict scrutiny test because there was evidence that initiative sponsors relied heavily on persons not registered to vote to communicate their ideas. *Id*. at 643. In this case, however, there is a lack of such evidence relating to residency. Plaintiffs have submitted no evidence that Idaho's residency requirement makes it more difficult to communicate ideas or to collect signatures. For example, there is no evidence that there are not enough Idaho residents to serve as circulators, or that non-residents make especially effective circulators. In the absence of such evidence, the Court must conclude that the residency requirement imposes a less-than-severe burden on speech, and hence is subject to a reasonableness analysis.

Idaho argues in this case that the residency requirement is reasonably related to its interest

in preventing fraud and ensuring that any circulator who commits fraud will be subject to the State's subpoena power. *See Initiative and Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001); *Keen v. Clark*, 56 F.Supp. 2d. 719 (S.D. Miss 1999). In *Jaeger*, the Eighth Circuit held that "the residency requirement allows North Dakota's Secretary of State to protect the petition process from fraud and abuse by ensuring that circulators answer to the Secretary's subpoena power." *Id*. at 616. *Keen* reached the same conclusion.

The Court finds *Jaeger* and *Keen* persuasive. Plaintiffs respond, however, that the residency requirement infringes on the First Amendment rights of non-residents who desire to circulate petitions. Donald Morgan testified in his affidavit that IRI "has members and supporters who do not live in Idaho, who would like to circulate initiative petitions in Idaho, but who are prevented from doing so by current law." *See Morgan Affidavit* at p. 3, ¶ 11.

There is no doubt that the residency requirement infringes on non-residents' First Amendment rights. However, as *Jaeger* pointed out, "many alternative means remain to non-residents who wish to communicate their views on initiative measures." *Id*. at 617. Non-residents are still free to speak to voters regarding particular measures and may train residents on the best way to collect signatures. The statute does not prohibit non-residents from accompanying circulators. As *Jaeger* held, "[t]he one restriction is that out-of-state residents cannot personally collect and verify the signatures, and that restriction is justified by the State's interest in preventing fraud." *Id*. at 617. The Court agrees with this analysis.

The Court therefore finds that the residency requirement of I.C. § 34-1807 passes muster under the reasonableness test. For that reason, the Court will reject plaintiffs' challenge to the statute.

Memorandum Decision – page 8

## 4. Analysis of I.C. § 34-1805

Idaho Code § 34-1805 requires petition sponsors (1) to obtain signatures equal in number to at least 6 percent of the qualified electors in Idaho at the time of the last election, and (2) to include in those signatures at least 6 percent of qualified electors from each of the 22 counties. It is this latter requirement that the plaintiffs challenge.

The Supreme Court struck down an Illinois statute that required the signatures of 200 qualified voters from each of at least 50 counties to nominate candidates from a new political party. *See Moore v. Ogilvie*, 394 U.S. 814 (1969). Illinois argued – as Idaho does here – that this restriction was designed to require statewide support rather than the support of a few populous counties. The Supreme Court responded as follows:

> It is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support for launching a new political party rather than support from a few localities. This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

*Id.* at 818.

Idaho argues that *Moore* is distinguishable because "[t]here is no fundamental interest in placing measures, as opposed to candidates, on the ballot." *See Plaintiffs' Brief* at 10. The Supreme Court effectively rejected this distinction, however, when it stated that "an election

**Memorandum Decision – page 9**

campaign is a means of disseminating ideas as well as attaining political office." *Illinois State Board of Elections v. Socialist Workers*, 440 U.S. 173, 187 (1979). Both measures and candidates disseminate ideas, and there is no principled basis for placing discriminatory restrictions on one that could not be placed on the other.

Thus, *Moore* applies here, and Idaho's law suffers from the same flaw as the Illinois law struck down in *Moore*. Because over 60% of Idaho's population resides in just 9 of the State's 44 counties, it is easy to envision a situation where 3/4 of Idaho's voters sign a petition but fail to get it on the ballot because they could not collect 6% of the vote in the rural counties. This scheme effectively gives rural voters preferential treatment in violation of *Moore's* proscription against giving a voter "twice or 10 times the voting power of another person . . . merely because he lives in a rural area." *Id.* at 1493 (quoting *Gray v. Sanders*, 372 U.S. 368 (1963)).

The Court will therefore grant plaintiffs' motion and strike the following language in Idaho Code § 34-1805: "Provided, that the petition must contain a number of signatures of qualified electors from each of twenty-two (22) counties equal to not less than six percent (6%) of the qualified electors at the time of the last general election in each of those twenty-two (22) counties."

## 5. Analysis of I.C. § 34-1821

Idaho Code § 34-1821 makes it a felony to "offer . . . or attempt to sell . . . any petition or any part thereof or of any signatures . . . ." As discussed above, plaintiff Ron Rankin has alleged that this statute discourages him from participating in the initiative process because he is worried about the criminal sanctions for violating the provision. Rankin's fear is not far-fetched. This statute could easily be interpreted to prohibit the common practice of paying circulators on a per-

signature basis. In other words, a circulator who is paid according to the number of signatures he obtains is essentially selling signatures, and could theoretically be subject to prosecution under the statute.

The Supreme Court scrutinizes First Amendment claims of chill and overbreadth more closely when criminal penalties are involved. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* 455 U.S. 489, 498-99 (1982) (expressing "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"). Furthermore, to the extent that this statute can be interpreted to restrict the manner in which circulators can be paid, it is subject to strict scrutiny. *See Meyer v. Grant*, 486 U.S. 414 (1988). In *Meyer*, the Supreme Court rejected Colorado's argument that a prohibition on paid circulators was necessary to insure the integrity of the initiative process:

> [N]o evidence has been offered to support th[e] speculation [that paid circulators will cheat], and we are not prepared to assume that a professional circulator – whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot."

*Id.* at 416. While *Meyer* did not discuss the details of payment, it certainly applies to payment on a per-signature basis. There is no evidence in this case that such payment invites cheating. Thus, under *Meyer*, payment on a per-signature basis is protected speech. Yet, it is made criminal under one interpretation of I.C. § 34-1821. Thus, this statute would chill a reasonable circulator, and has chilled plaintiff Ron Rankin, from engaging in protected speech. For these reasons, the

Court finds that I.C. § 34-1821(a) violates the First Amendment.

## 6.   Analysis of I.C. § 34-1815

Idaho Code § 34-1815 makes it a crime for any person to

wilfully or knowingly circulate, publish or exhibit any false statement or

representation, whether spoken or written, or to fail to disclose any material provision

in a petition, concerning the contents, purport, or effect of any petition . . .for the

purpose of obtaining any signature to any such petition, or for the purpose of

persuading any person to sign any such petition.

This language raises ambiguities about the scienter requirement. Under one reading of

the statute, the phrase "wilfully and knowingly" modifies the phrase "false statement," requiring

the prosecutor to prove that the circulator wilfully and knowingly made a false statement.

However, under an equally reasonable reading, the phrase "wilfully and knowingly" only applies

to the circulation requirement, allowing the prosecutor to charge a circulator for wilfully

circulating a petition containing a false statement even though the circulator did not know about

the false statement.

A reasonable circulator would be chilled from exercising protected speech by this vague

statute that threatens criminal liability. This chill would qualify as a "severe" burden under

*Buckley's* analysis, and thus the statute may be upheld only upon a showing that it is narrowly

tailored to meet a compelling state interest.

The Supreme Court addressed the "narrowly tailored" prong of the test when faced with a

similar content-based restriction with vague terms and potential criminal liability that chilled

First Amendment speech in *Reno v. ACLU*, 521 U.S. 844 (1997). There, the Court struck down

the Communications Decency Act (CDA), legislation that was intended to protect minors from accessing indecent or patently offensive material on the Internet by imposing criminal sanctions on knowing creators and transmitters of such material. The Supreme Court found that the CDA's vague criminal provisions "undermined the likelihood that the CDA has been carefully tailored to the congressional goal of protecting minors from potentially harmful materials." *Id.* at 870.

Similarly, the vagueness of the scienter requirement in Idaho Code § 34-1815 undermines the likelihood that the statute has been narrowly tailored to Idaho's goal of preventing false statements. For this reason, the Court follows *Reno* and will strike those vague provisions of the statute.

The statute is much more clear in not applying the scienter requirement to the "failure to disclose" provision. The "failure to disclose" provision is a separate phrase set off by commas and not modified by the scienter language. While absolved of ambiguity, this part of the statute goes from bad to worse by creating a strict liability offense. The Supreme Court has held that a strict liability criminal offense that chills First Amendment speech is unconstitutional. *See Smith v. California*, 361 U.S. 147 (1959). In *Smith*, a California statute imposed strict criminal liability on booksellers who sold obscene books -- a bookseller could be sanctioned for knowingly selling books and having an obscene book in his store, regardless of his knowledge of the book's obscenity. While recognizing that "it is doubtless competent for the States to create strict criminal liabilities," *id.* at 150, the Court held that "the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller." *Id.* at 152-53. Likewise with the circulator of initiative petitions.

Thus, I.C. § 34-1815 fails to withstand strict scrutiny. The statute is unconstitutionally

vague in part, and creates, in another part, an unconstitutional strict liability offense. For these

reasons, the Court will grant plaintiffs' motion with regard to I.C. § 34-1815.

## 7. Conclusion

In conclusion, the Court finds that the residency requirement in Idaho Code § 34-1807 is

constitutional. The Court further finds the following statutory provisions unconstitutional:

(1) the requirement in Idaho Code § 34-1805 that a petition must contain signatures from 6% of

qualified electors in each of 22 counties; (2) the provisions in Idaho Code § 34-1815 that make

unlawful "for any person to wilfully or knowingly circulate, publish or exhibit any false

statement or representation, whether spoken or written, or to fail to disclose any material

provision in a petition, concerning the contents, purport, or effect of any petition mentioned in

sections 34-1801A through 34-1822, Idaho Code, for the purpose of obtaining any signature to

any such petition, or for the purpose of persuading any person to sign any such petition."; and (3)

Idaho Code § 34-1821(a).

The Court is not striking down any Idaho statutory provision not specifically mentioned

above. For example, while the Court strikes down Idaho Code § 34-1821(a), the Court's

decision has no affect on subsections (b) and (c) of that statute, which were not challenged in this

litigation. Similarly, while the Court strikes down the language quoted above from Idaho Code

§ 34-1815, the last two sentences of that statute are not affected by the Court's decision. Finally,

the Court's decision regarding Idaho Code § 34-1805 only strikes down the last sentence of that

statute and leaves the remainder of the statute unaffected. The Court will issue a separate

Judgment as required by Rule 58.

Dated this 3rd day of _November_, 2001.

_B. Lynn Winmill_
B. LYNN WINMILL
CHIEF JUDGE, UNITED STATES DISTRICT COURT

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this

_30th_ day of November, 2001, to the following parties:

Christ Troupis
TROUPIS & SUMMER
P.O. Box 1367
Meridian, ID 83680
Fax (208) 288-0400

Paul Grant
6426 South Quebec Street
Englewood, CO 80111
Fax (303) 741-5619

Brian P. Kane
Kirsten L. Wallace
OFFICE OF ATTORNEY GENERAL
Civil Litigation Division
P.O. Box 83720
Boise, ID 83720-0010
Fax (208) 334-2830


Cameron S. Burke, Clerk
United States District Court

_____
Ladonna Garcia, Deputy Clerk

```
* * * COMMUNICATION RESULT REPORT ( NOV.30.200  12:50PM ) * * *
                                                    TTI   WINMILL

FILE MODE        OPTION              ADDRESS (GROUP)        RESULT        PAGE
-----------------------------------------------------------------------------
799  MEMORY TX                       92880400              OK           P. 18/18
                                     913037415619          OK           P. 18/18
                                     93342830              OK           P. 18/18

-----------------------------------------------------------------------------
REASON FOR ERROR
        E-1) HANG UP OR LINE FAIL               E-2) BUSY
        E-3) NO ANSWER                          E-4) NO FACSIMILE CONNECTION
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

U.S. DISTRICT COURT
DISTRICT OF IDAHO

NOV 3 0 2001

FILED
LODGED
CHAMBERS OF B. LYNN WINMILL

| | | |
|---|---|---|
| IDAHO COALITION UNITED FOR BEARS, et al, | ) ) ) | Civ. No. 00-0668-S-BLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | JUDGMENT |
| PETE T. CENARRUSA, in his official capacity as Idaho Secretary of State, | ) ) ) | |
| Defendants. | ) ) | |

In accordance with the Memorandum Decision filed with this Judgment,

NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that

the plaintiffs' motion for summary judgment (docket no. 27) is hereby GRANTED IN PART